| | |
|---|---|
| DANNY L. DOGAN, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | )      CAUSE NO.: 2:11-CV-246-PRC |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of the Social Security | ) |
| Administration, | ) |
| Defendant. | ) |

## OPINION AND ORDER

This matter is before the Court on a Complaint [DE 1], filed by Plaintiff Danny L. Dogan on July 8, 2011, and Plaintiff's Memorandum in Support of His Motion to Reverse the Decision of the Commissioner of Social Security [DE 19], filed by Mr. Dogan on December 9, 2012. Mr. Dogan requests that the decision of the Administrative Law Judge denying his supplemental security income and disability insurance benefits be reversed or, alternatively, remanded for further proceedings. On February 15, 2012, the Commissioner filed a response, and on February 29, 2012, Mr. Dogan filed a reply. For the following reasons, the Court grants Mr. Dogan's request for remand.

## PROCEDURAL BACKGROUND

On July 20, 2006, Mr. Dogan filed for both supplemental security income ("SSI") and disability insurance benefits ("DIB") with the U.S. Social Security Administration alleging that he became disabled on April 1, 1997, due to arthritis of the knees, high blood pressure, obesity, edema, anxiety, depression, and a learning disability. (Administrative Record, hereafter AR. 11, 80, 86). Mr. Dogan's concurrent applications were denied on September 28, 2006, as was his request for

reconsideration on May 15, 2007. (AR. 83-86, 89-95, 96-102). On May 29, 2007, Mr. Dogan requested a hearing. (AR. 104).

On August 4, 2008, Administrative Law Judge ("ALJ") Dennis R. Kramer held a hearing and issued a partially favorable decision on September 3, 2008. (AR. 11-19, 24-79, 443-98). The ALJ found Mr. Dogan disabled as of April 21, 2008, but not prior thereto. (AR. 18). Mr. Dogan filed a Request for Review of the unfavorable portion of the ALJ's September 3, 2008, decision, but the Appeals Council denied his request on May 22, 2009, making the ALJ's decision the final decision of the Commissioner. (AR. 1-3). Mr. Dogan then appealed the ALJ's decision to the United States District Court for the Northern District of Indiana. In reviewing the ALJ's decision, the district court determined that the ALJ failed to properly: (1) weigh the opinion of a nurse practitioner as required by Social Security Ruling ("SSR") 06-3p, (2) analyze the credibility of Mr. Dogan's testimony by utilizing the regulatory factors listed in SSR 96-7p, (3) consider Mr. Dogan's obesity under SSR 02-1p by itself and also in combination with his other impairments, and (4) evaluate Mr. Dogan's limited ability to stoop as required by SSR 96-9p. As a result of these errors, the district court issued an opinion and order reversing the ALJ's decision and remanding the case to the Commissioner. *See Dogan v. Astrue*, 751 F.Supp.2d 1029 (N.D. Ind. 2010) (hereinafter "June 3, 2010 remand order").

After the case was remanded, ALJ Kramer held a new hearing on March 9, 2011, at which Mr. Dogan, a medical expert ("ME") and a vocational expert ("VE") testified. (AR. 393-440). ALJ Kramer issued a new decision on May 3, 2011, finding Mr. Dogan disabled as of May 29, 2006, but not prior thereto. (AR. 372-87). The ALJ made the following findings under the required five-step analysis:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2002.

2. The claimant has not engaged in substantial gainful activity since [April 1, 1997] the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. From the alleged onset date of disability, April 1, 1997, to the date last insured, December 31, 2002, the claimant had the following severe impairments: [m]orbid obesity and [a] sprain of the right knee. Since the established onset date of disability, May 29, 2006, and at most six months prior thereto, the claimant has had the following severe impairments: [m]assive morbid obesity and osteoarthritis and degenerative joint disease of the left knee (20 CFR 404.1520(c) and 416.920(c)).

4. Prior to May 29, 2006, the date the claimant became disabled, the claimant did not have an impairment or combination or impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, I find that prior to May 29, 2006, the date the claimant became disabled, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: the claimant could sit for a total of about six hours in an eight-hour workday and stand and/or walk for a total of about six hours in an eight-hour workday, with normal breaks; the claimant could never climb ladders, ropes, or scaffolds; the claimant could occasionally climb ramps and stairs, and balance, kneel, stoop, crouch, or crawl; the claimant had difficulty with reading and writing.

6. Since April 1, 1997, the claimant has been unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. Prior to the established disability onset date, the claimant was a younger individual age 18-49 (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English. Although he graduated [from] high school, the claimant attended special education (20 CFR 404.1564 and 416.964).

9. Prior to May 29, 2006, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled" whether

or not the claimant has transferrable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.      Prior to May 29, 2006, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11.      Beginning on May 29, 2006, the severity of the claimant's impairments has medically equaled the criteria of section 1.02A of 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

12.      The claimant was not disabled prior to May 29, 2006 (20 CFR 404.1520(g) and 416.920(g)) but became disabled on that date and has continued to be disabled through the date of this decision (20 CFR 404.1520(d) and 416.920(d)).

13.      The claimant was not under a disability within the meaning of the Social Security Act at any time through December 31, 2002, the date last insured (20 CFR 404.315(a) and 404.320(b)).

(AR. 375-87).

Mr. Dogan now requests judicial review of the ALJ's May 3, 2011, decision, which constitutes the final decision of the Commissioner. (A.R. 367-69).

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g).

## FACTS

### A. Background

Mr. Dogan was born in 1958. (AR. 398). He was 53 years old when the ALJ issued his decision and 38 years old at the date of the alleged onset of disability. (AR. 372-87, 395). He

testified that he had difficulty in school, particularly with English, reading and writing, and took special education classes. (AR. 414-15). He graduated from high school, and held a number of jobs before he injured his knees when he fell down on some ice and could not longer work because of severe knee and leg pain. (AR. 399-406, 415).

## B. Medical Evidence

From 1995 through 1997, Dr. Jacob Pruitt treated Mr. Dogan and diagnosed right knee pain and a sprained left ankle with swelling. (AR. 217-20). Mr. Dogan was also diagnosed with a sprain of the collateral ligament of the right knee, which had an onset date of February 1996. (AR. 226). In January 1999, Mr. Dogan complained of continuing knee problems, but indicated that he could not afford to see a physician. (AR. 222). In February 1999, Mr. Dogan weighed 300 pounds and discussed the possibility of applying for disability benefits. (AR. 223-24). At that time, he told his physician that he had right knee pain while standing since 1996, and there was no change in his symptoms. (AR. 223). As of April 2002, Mr. Dogan weighed over 350 pounds. (A.R. 224). In December 2005, Mr. Dogan complained of right knee pain resulting from an injury he sustained when he fell in 1995 or 1996, right ankle swelling and pain since 2002, and that he had struggled with his weight all of his life. (AR. 268).

From 2006 to 2007, Mr. Dogan was a patient at St. Clare Health Clinic. (AR. 258-63, 266). During that period, he was measured as being about five feet six inches in height and weighed between 330 and 387 pounds. (AR. 258, 262, 267). He was diagnosed with morbid obesity, severe degenerative joint disease of the knees, hypertension, depression, and anxiety. (AR. 258-63, 266). He had 1+ edema on the right, ambulated with a limp, and had difficulty getting up and down. (AR. 258). Mr. Dogan had a decreased range of motion of the back and hip with pain and tenderness in

both knees. (AR. 262). The physician noted crepitus with movement of the left knee along with generalized tenderness and mild effusion. (AR. 259). A May 29, 2006, x-ray of Mr. Dogan's left knee showed "prominent marginal osteophytes with adjacent joint space sclerosis consistent with moderate tricompartmental osteoarthritis." (AR. 287). Mr. Dogan was prescribed Zoloft, Toprol, and Lopressor for his pain and depression. (AR. 267).

Mr. Dogan next underwent a number of consultative evaluations and his medical file was reviewed by various psychologists and physicians in 2006 and 2007. For instance, on September 28, 2006, Joelle J. Larsen, Ph.D., a Social Security Administration ("SSA") non-examining state agency psychologist, reviewed Mr. Dogan's medical file and filled out a Psychiatric Review Technique form, but found that there was insufficient evidence to render an opinion. (AR. 235-48). About five months later, on March 8, 2007, Dr. Oranu Ibekie, a licensed physician for the SSA Disability Determination Bureau, conducted a consultative evaluation of Mr. Dogan. (AR. 326-30). Dr. Ibekie's evaluation notes indicate that Mr. Dogan has a history of hypertension, sleep apnea, degenerative joint disease of the knees and lower back, obesity, depression, and anxiety. (AR. 326). He also noted that Mr. Dogan weighed 350 pounds and assessed him as having stiffness and tenderness in both knees after walking only 20 feet. (AR. 327, 328). Dr. Ibekie found Mr. Dogan's range of motion in his knees, ankles, and cervical and lumbar spines abnormal and that Mr. Dogan was unable to stand for significant periods during the examination. (AR. 328, 330).

As part of the consultative examination, Dr. Ibekie evaluated Mr. Dogan's motor strength. (AR. 328). Dr. Ibekie assessed Mr. Dogan's strength at 4/5 in all proximal and distal muscles of his four extremities, his grip strength was assessed at 3/5, and his fine finger manipulative abilities were assessed at 3/5. *Id.* Dr. Ibekie diagnosed Mr. Dogan with morbid obesity, hypertension,

chronic osteoarthritis of the knees and lower back, sleep apnea, severe depression, gait dysfunction, and lower extremity edema. (AR. 329). He opined that Mr. Dogan could stand, sit, and walk with limitation, and he could lift and carry with difficulty. *Id*. Dr. Ibekie also indicated that Mr. Dogan's fine finger manipulation abilities (i.e., writing, zipping, and buttoning) would be limited and his gross finger manipulation abilities (i.e., dialing or turning a door knob) would be difficult. *Id*.

On March 9, 2007, Dr. Caryn Brown, Psy.D, a licensed clinical psychologist for the SSA's Disability Determination Bureau, performed a consultative evaluation of Mr. Dogan. (AR. 290-94). At that time, Mr. Dogan reported to Dr. Brown that "his disability [was] primarily physical in nature" because he experienced pain and difficulty with his knees. (AR. 290). He also stated that he had graduated from high school, but he had learning disabilities in math and reading, and he weighed almost 400 pounds. *Id.* Dr. Brown administered IQ tests, which indicated that Mr. Dogan has a verbal IQ of 86, a performance IQ of 80, and a full scale IQ of 82. (AR. 293). She diagnosed Mr. Dogan with a mood disorder and morbid obesity. *Id.* On the same day, Dr. J. Gange, Ph.D, a non-examining state agency psychologist, also reviewed Mr. Dogan's medical file and filled out a Psychiatric Review Technique form. (AR. 295-308). Dr. Gange opined that Mr. Dogan's mood disorder did not constitute a severe impairment and he had only mild limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace. (AR. 295, 298, 305).

About two months later, on May 7, 2007, Dr. B. Sheikh, a licensed physician for the SSA's Disability Determination Bureau, conducted a consultative evaluation of Mr. Dogan. (AR. 343-48). Dr. Sheikh first noted that Mr. Dogan experiences crepitations if he sits for too long, has a hard time getting up, and needed a bilateral knee replacement. (AR. 343). He also indicated that Mr. Dogan

weighed 425 pounds and could not stand for very long because his knees would give out. (AR. 343-44). Dr. Sheikh noted that Mr. Dogan had bilateral leg swelling with numbness in his lower extremities, and his hypertension was not controlled by medication. (AR. 343, 346). Mr. Dogan's medications included Toprol, Hydrochlorothiazide, and Zoloft. (AR. 343). Dr. Sheikh's examination indicated that Mr. Dogan was unable to walk heel to toe or tandem walk, and he could not stoop or squat, but Mr. Dogan had normal strength and sensation in his lower extremities. (AR. 346). Dynamometer grip testing showed that Mr. Dogan was able to generate 45 kilograms of force using both hands. *Id*. Dr. Sheikh diagnosed morbid obesity, bilateral leg parasthesias, and multiple joint pain due to arthritis. (AR. 347).

On May 14, 2007, Dr. M. Ruiz, a non-examining state agency physician, reviewed Mr. Dogan's medical file and completed a Physical Residual Functional Capacity ("RFC") Assessment form. (AR. 333-40). Dr. Ruiz opined that Mr. Dogan could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand or walk about six hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and push or pull without limitation. (AR. 334). He also determined that Mr. Dogan could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but he could never climb ladders, ropes, or scaffolds. (AR. 335). Mr. Dogan also had limited ability to reach, handle (i.e., gross manipulation), and finger (i.e., fine manipulation). (AR. 336). Dr. Ruiz diagnosed Mr. Dogan with morbid obesity and osteoarthritis. (AR. 333).

About one year later, on April 9, 2008, Nurse Practitioner Susan Bucholz filled out a Physical RFC Questionnaire, noting that she began treating Mr. Dogan in December 2008. (AR. 351-55). She diagnosed degenerative joint disease of the knees, morbid obesity, hypertension, and anxiety. (AR. 351). Nurse Bucholz noted that Mr. Dogan had pain in his knees and hip, which

8

increased when he walked or stood. *Id.* She determined that Mr. Dogan's pain and other symptoms were severe enough to interfere with his attention and concentration (i.e., more than 66 percent of a workday), and he was not capable of performing even low stress jobs. (AR. 352). Nurse Bucholz estimated that Mr. Dogan could sit for about one hour, stand for about 10 minutes, and walk less than one block. *Id.* She determined that Mr. Dogan could sit for a total of about two hours in an eight-hour workday and stand and walk for less than two hours in an eight-hour workday. (AR. 353). Mr. Dogan would also need to shift positions at will and take unscheduled breaks one to three times a day for about 15 minutes at a time. *Id.* Nurse Bucholz opined that Mr. Dogan could rarely lift and carry 10 pounds or less, and never lift and carry 20 pounds or more. *Id.* She determined that Mr. Dogan could occasionally look down, turn his head right or left, and hold his head in a static position. (AR. 354). Nurse Bucholz also found that Mr. Dogan could rarely look up, twist, or climb stairs, and he could never stoop, crouch, squat, or climb stairs. *Id.* Furthermore, she determined that Mr. Dogan would likely be absent from work more than four days per month as a result of his impairments. *Id.*

On August 4, 2008, Dr. William Newman, the ME who testified at the first administrative hearing, filled out a physical Medical Source Statement Of Ability To Do Work-Related Activities form at the request of the SSA. (AR. 360-66). Dr. Newman first found that Mr. Dogan could occasionally lift 11 to 20 pounds and frequently lift up to 10 pounds. (AR. 360). He indicated that Mr. Dogan could sit for about one and one-half hours at a time, and stand and walk for about 30 minutes at a time. (AR. 361). Dr. Newman reported that Mr. Dogan could sit for about six hours and stand and walk for a total of two hours in an eight-hour workday. *Id.* He determined that Mr. Dogan could never climb ladders or scaffolds, but he could occasionally climb stairs and ramps, and

operate foot controls. (AR. 362, 363). Dr. Newman assessed Mr. Dogan as being able to stoop, kneel, crouch and crawl for one-third of the day, but he could never be around unprotected heights or moving mechanical parts. (AR. 363, 364). Furthermore, Dr. Newman determined that Mr. Dogan had the ability to occasionally operate a motor vehicle and be exposed to vibration. (AR. 364).

### C. Mr. Dogan's Testimony

At the March 9, 2011, administrative hearing, Mr. Dogan testified that he had an accident in 1995 or 1996 when he fell down on some ice and injured his knees, particularly his right knee. (AR. 399-400, 406). He explained that he tried to work for about a year after the accident, but his knees got progressively worse so he stopped working and filed a claim for disability benefits. *Id.* Mr. Dogan stated that before his accident he worked as a maintenance mechanic technician in a chemical plant for nine years. (AR. 400-03).

Mr. Dogan testified that his pain first started in his right leg, but he also has pain in his left leg. (AR. 406). He explained that the pain in his right leg began when he fell down and his physician took an x-ray of his right knee and prescribed anti-inflammatory medication. *Id.* Mr. Dogan was told to use a cane, but because he did not like using a cane he tried to stay away from it as much as possible. (AR. 407). He eventually developed some pain in his left knee and leg and his physician advised him to lose weight because his condition would get progressively worse. *Id.* Mr. Dogan described having right knee pain as high as a "10," on a scale of one to 10, and, at that point, he could not move his leg at all. (AR. 409). He explained that he was sent to see a bone specialist and told that he needed a knee replacement, but he was too heavy for one. *Id.* Mr. Dogan testified that he has difficulty with his knees popping, which also cause him pain. (AR. 409-10).

He also described right hip and lower back pain, which began after he had a snowmobile accident in 1983 or 1985. (AR. 410-11).

Mr. Dogan stated that he lived in his family's home all of his life and, before his mother passed away in 2005, he lived with her and "helped out a little" around the house. (AR. 412). For example, he explained that he washed dishes, but when he did this type of chore he could only do it for a "few minutes" because his knees would "start hurting" and then he would need to "stop and sit down" until his knees "settle[d] down enough" to "get up and pick it up again." (AR. 412-13). Mr. Dogan also vacuumed, which he could do for maybe "10 to 15 minutes" at a time before he would need to sit down. (AR. 413). He would sit down for anywhere from 15 to 30 minutes to take the pressure off of his knees and legs and typically his pain level during this period would be a seven or eight, on a scale of one to 10. (AR. 414). Mr. Dogan relieved his pain by sitting rather than taking medication because he believes that long-term use of medication will cause liver damage. *Id.* He explained that he was able to do laundry occasionally, but it required him to go down six or seven basement stairs. (AR. 422). Furthermore, he stated that he was able to use a riding lawn mover. (AR. 413).

Mr. Dogan stated that he graduated from high school, but that he took special education classes in all required subjects, including English, math, and reading. (AR. 414-15). He explained that he has difficulty reading the newspaper and filling out job application forms. (AR. 415). Mr. Dogan testified that he is able to drive, but because of his learning disability, the written test was administered orally, which he passed with no marks against his license. (AR. 417).

Mr. Dogan next described the multiple physical limitations that interfered with his ability to work for the period of April 1, 1997 to December 31, 2002.[1] Specifically, Mr. Dogan testified that the most he could lift and carry was 10 pounds and the farthest that he could walk was 100 feet from the door of his house to his mailbox, but even walking that short distance caused him pain. (AR. 419). Mr. Dogan testified that he could stand for about 20 minutes, but at that point his knees would begin to hurt and he would need to sit down. (AR. 420). He is not able to sit for more than 30 minutes before he needs to get up and move around a bit. (AR. 420-21). Mr. Dogan explained that when he sits he elevates his legs and that typically he elevates his legs seven hours out of an eight-hour day. (AR. 421-22). He stated that he has difficulty going up and down stairs and he has not been able to wear socks until his recent 100 pound weight loss. (AR. 423-24). Mr. Dogan reported that he lies down in his bed about two times a day for 30 minutes at a time. (AR. 424). He also explained that when he is not doing anything, he lies down and elevates his legs to take the pressure off of his knees. (AR. 418). Additionally, Mr. Dogan testified that he had pain when he knelt, squatted, and bent over. (AR. 423).

Mr. Dogan further testified that he gets severe cramping in his upper thighs that is brought on by severe cold weather and muscle fatigue. (AR. 427). He explained that he can have pain or tension in his knees while he is sitting down and the pain affects his ability to concentrate and distracts him from what he is doing. (AR. 428). Mr. Dogan also stated that he has difficulty changing positions from sitting to standing and when he stands up from sitting for a long period of time his back is "hunched over." *Id.* He testified that he walks more slowly than most people and

---

[1] The ALJ first asked Mr. Dogan to describe the physical limitations he had as of December 31, 2002, the date Mr. Dogan was last insured for purposes of DIB. (AR. 373, 419). The ALJ later asked Mr. Dogan to describe his physical limitations for the period he alleges his disability began on April 1, 1997, through December 31, 2002. (AR. 424). Mr. Dogan ultimately testified that his limitations were consistent throughout this period.

he has to "navigate the stairs" one step at a time. (AR. 428-29). Furthermore, Mr. Dogan explained that he has difficulty with his hands because his thumbs "lock up" when he holds a book or pen for more than 15 to 30 minutes. (AR. 429).

### D.  Medical Expert Testimony

At the administrative hearing, an ME, testified that for the period of April 1, 1997, through December 31, 2002, Mr. Dogan suffered from morbid obesity, which would limit him to light work. (AR. 431-32). The ME stated that the only diagnosis other than morbid obesity that he found in the medical records for that period pertained to a sprain of Mr. Dogan's right knee, which involved the lateral ligaments. (AR. 431). The ME testified that the only x-ray evidence in the record was from May 29, 2006, which showed moderate osteoarthritis of the left knee. (AR. 431). The ME testified that for the period April 1, 1997 through December 31, 2002, Mr. Dogan's impairments did not meet or equal any listed impairment. *Id.*

When questioned by Mr. Dogan's attorney about whether it was possible that the left knee arthritis indicated in Mr. Dogan's May 29, 2006, x-ray could have been present in his knee in 2002, the ME responded: "It's not impossible." (AR. 434). The ME explained that based on the combination of Mr. Dogan's left knee arthritis, which was supported by the May 29, 2006 x-ray, and his massive obesity, his impairment equaled Listing 1.02A.[2] (AR. 435). The ME stated that any retrospective opinion that he could give typically was limited to, at most, that Mr. Dogan's impairments would equal Listing 1.02A six months prior to May 29, 2006. *Id.*

---

[2] Listing 1.02A provides that an individual must demonstrate: (1) a gross anatomical joint deformity, (2) chronic joint pain and stiffness or other limitation in motion, (3) medical imaging documenting the abnormality, and (4) an "inability to ambulate effectively." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.02A. The fourth requirement of Listing 1.02A, an inability to ambulate effectively, is defined as an extreme limitation of the ability to walk that interferes with an individual's ability to initiate, sustain, or complete activities. *Id.* § 1.00B2b(1).

### E.  Vocational Expert Testimony

A VE testified that Mr. Dogan's past relevant work as a maintenance machine technician or repairer constitutes skilled and medium-level work.  (AR. 437).  The ALJ then posed a hypothetical to the VE asking him to assume an individual who has a twelfth grade education and shares the claimant's vocational profile.  Specifically, the ALJ asked the VE to assume that such an individual has difficulty with reading and writing, but could occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, stand or walk about six hours in an eight-hour workday, and sit about six hours in an eight-hour workday.  *Id.*  This hypothetical individual could not climb ladders, ropes, or scaffolds, could occasionally climb ramps or stairs, could occasionally balance, stoop, kneel, crouch, or crawl, and had unlimited pushing and pulling and manipulative abilities.  *Id.*  Based on these limitations, the ALJ asked if there are jobs in the economy that this individual could perform.  (AR. 437-38).  The VE responded to the hypothetical with three skilled light work job titles: belt repairer, aviation support equipment repairer, and inspecting machine adjuster.  (AR. 438-39).  The VE also identified three unskilled light work job titles: marker, mail clerk, and routing clerk.  (AR. 439).

### STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard.  *See Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).  Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ's findings are supported by substantial evidence and under the correct legal standard. *See Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000). If an error of law is committed by the Commissioner, then the "court must reverse the decision regardless of the volume of evidence supporting the factual findings." *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

An ALJ must articulate, at a minimum, his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind [his] decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). The ALJ must build an "accurate and logical bridge from the evidence to his conclusion so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Young v. Barnhart*,

362 F.3d 995, 1002 (7th Cir. 2004) (quoting *Scott*, 297 F.3d at 595); *see also Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999) (citing *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that he suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). To be found disabled, the claimant's impairment must not only prevent him from doing his previous work, but considering his age, education, and work experience, it must also prevent him from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The steps are: (1) Is the claimant engaged in substantial gainful activity? If yes, the claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to step two; (2) Does the claimant have an impairment or combination of impairments that are severe? If not, the claimant is not disabled, and the claim is denied; if yes, the inquiry proceeds to step three; (3) Do(es) the impairment(s) meet or equal a listed impairment in the appendix to the regulations? If yes, the claimant is automatically

considered disabled; if not, then the inquiry proceeds to step four; (4) Can the claimant do the claimant's past relevant work? If yes, the claimant is not disabled, and the claim is denied; if no, then the inquiry proceeds to step five; (5) Can the claimant perform other work given the claimant's RFC, age, education, and experience? If yes, then the claimant is not disabled, and the claim is denied; if no, the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(I)-(v), 416.920(a)(4)(I)-(v); *see also Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).

At steps four and five, the ALJ must consider an assessment of the claimant's RFC. "The RFC is an assessment of what work-related activities the claimant can perform despite [his] limitations." *Young*, 362 F.3d at 1000. The ALJ must assess the RFC based on all the relevant evidence of record. *Id.* at 1001 (citing 20 C.F.R. § 404.1545(a)(1)). The claimant bears the burden of proving steps one through four, whereas the burden at step five is on the ALJ. *Id.* at 1000; *see also Zurawski*, 245 F.3d at 886; *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

## ANALYSIS

Mr. Dogan seeks reversal and remand of the ALJ's decision arguing the following reasons: (1) the ALJ improperly evaluated the credibility of Mr. Dogan's testimony under SSR 96-7p; and (2) the ALJ did not apply the requirements of SSR 83-20 in determining the onset date of Mr. Dogan's disability. Mr. Dogan also asks the Court to award him benefits because the ALJ's credibility analysis was based on the same flawed reasoning that required reversal in the first appeal. The Court now considers each of the asserted grounds for remand or reversal in turn.

### A. Credibility Determination

Mr. Dogan argues that the ALJ violated the law of the case doctrine established by the June 3, 2010 remand order because his second decision was based on the same flawed credibility

determination that required reversal in the first appeal. (Pl.'s Mem. at 9-13, 20). First, Mr. Dogan claims that the ALJ erred by using the boilerplate wording criticized by the Seventh Circuit and by improperly assessing the credibility of his testimony after he developed the RFC finding. *Id*. at 9-10. Mr. Dogan next argues that the ALJ did not sufficiently discuss the factors listed in SSR 96-7p, and he never explained which portions of his testimony he found incredible or inconsistent with the medical evidence. *Id.* at 9-11. Lastly, Mr. Dogan contends that the ALJ failed to discuss his limited daily activities, which support his claims of disabling pain and limitations. *Id*. at 9, 11-12. The Commissioner, however, asserts that the ALJ's five-page credibility assessment establishes that he thoroughly discussed and explained his findings on this issue. (Def.'s Mem. at 7). Thus, according to the Commissioner, the ALJ properly considered the record evidence, including the objective medical evidence, Mr. Dogan's daily activities, his sporadic treatment history, his reliance on non-prescription pain medication, and his allegations of disabling limitations in assessing Mr. Dogan's credibility. *Id.* at 7-8.

An ALJ's credibility finding will be afforded "considerable deference" and will be overturned only if it is "patently wrong." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (citations omitted). "A credibility assessment is afforded special deference because the ALJ is in the best position to see and hear the witness and determine credibility." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000) (citation omitted). However, where the credibility determination is based on objective factors rather than subjective considerations, an ALJ is in no better position than the court and so the court has greater freedom to review it. *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). In either case, the ALJ must provide an explanation for his credibility assessment that is sufficient to give the reviewing court a fair sense of how he weighed the claimant's testimony.

*Zurawski*, 245 F.3d at 887. The ALJ's credibility determination must construct a "logical bridge" from the evidence to the conclusion. *See Myles v. Astrue*, 582 F.3d 672, 674 (7th Cir. 2009).

In crafting a credibility determination, the ALJ must weigh the claimant's subjective complaints, the relevant objective medical evidence, and any other evidence of the following factors:

(1)   The individual's daily activities;
(2)   Location, duration, frequency, and intensity of pain or other symptoms;
(3)   Precipitating and aggravating factors;
(4)   Type, dosage, effectiveness, and side effects of any medication;
(5)   Treatment, other than medication, for relief of pain or other symptoms;
(6)   Other measures taken to relieve pain or other symptoms;
(7)   Other factors concerning functional limitations due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). Under SSR 96–7p, the ALJ's determination regarding credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." 1996 WL 374186, at *2. In this regard, it is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." *Id.* It is also not enough for the adjudicator simply to "recite the factors that are described in the regulations" for evaluating symptoms. *Id.*; *see also Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002).

SSR 96-7p also establishes a two-step process for evaluating symptoms, such as pain. SSR 96-7p, 1996 WL 374186, at *2. First, the ALJ must consider whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's pain or other symptoms. *Id.* Second, if there is such an underlying physical or mental impairment, the ALJ must evaluate the intensity, persistence, and limiting effects of a claimant's

symptoms to determine the extent to which the symptoms limit a claimant's ability to perform basic work activities. *Id.* If a claimant's statements about the intensity, persistence, or functional limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of a claimant's statements based on his consideration of the entire case record. *Id.*

An ALJ cannot discredit a claimant's testimony about his pain and limitations "solely because there is no objective medical evidence supporting it." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) (citations omitted). In other words, an ALJ is not permitted to "disbelieve [a claimant's] testimony solely because it seems in excess of the 'objective' medical testimony." *Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) (citation omitted). SSR 96-7p specifically requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citation omitted).

Here, the ALJ's credibility determination is legally insufficient because he did not explain his rationale for finding Mr. Dogan's testimony not credible prior to May 29, 2006, the date the ALJ determined Mr. Dogan became disabled. While the ALJ provided a detailed accounting of Mr. Dogan's testimony in his decision, he did not properly articulate why he found his testimony inconsistent with the record evidence. First, the ALJ erred in his credibility determination because he failed to explain why the medical evidence does not support Mr. Dogan's claims of disabling pain and limitations. At the hearing, Mr. Dogan testified that he suffers from severe pain in his knees and

legs, and described the multiple limitations that result from his impairments. For example, he explained that he is unable to stand for more than 20 minutes before his knees begin to hurt and then he would need to sit down and he is unable to sit for longer than 30 minutes before he would need to get up and move around. (AR. 420-21). Mr. Dogan also testified that he could only lift and carry 10 pounds and he could walk only about 100 feet from his house to his mailbox before he begins to experience knee and leg pain. (AR. 419). He further explained that he typically elevates his legs about seven hours a day, has difficulty climbing stairs, gets pain in his knees while he is sitting down, and has difficulty changing positions from sitting to standing. (AR. 421-22, 423-24, 428). There is ample medical evidence in the record to support Mr. Dogan's history of knee and leg pain, osteoarthritis, and morbid obesity. (AR. 217-20, 222-24, 226, 258-63, 266-68, 287, 326-30, 333, 343-44, 346-47, 351). But other than the ALJ's statement that he did "not fully credit the claimant's testimony, and the claimant's alleged pain levels and symptoms are out of proportion to [the] objective findings," the ALJ never explained which portions of Mr. Dogan's testimony he found incredible and inconsistent with the medical evidence. (AR. 384). That amounts to reversible error. *See e.g., Zurawski*, 245 F.3d at 887-88 (noting that the ALJ should have explained why the claimant's testimony and complaints of pain were inconsistent with the medical evidence); *Clifford*, 227 F.3d at 227 (noting that where a claimant's testimony is supported by some objective medical evidence, the ALJ cannot simply disregard that testimony).

But even if Mr. Dogan's allegations of pain and limitations are not fully supported by objective medical evidence, the Seventh Circuit has instructed that if the claimant indicates that pain is a significant factor in his inability to work, the ALJ must obtain a claimant's description of his daily activities by asking specific questions about the pain and how it effects the claimant. *Luna v.*

*Shalala*, 22 F.3d 687, 691 (7th Cir. 1994) (citation omitted).  The ALJ is required to investigate all avenues that relate to pain, which include a claimant's prior work record, information and observations by treating physicians, examining physicians, and third parties.  Furthermore, the ALJ must also consider the nature and intensity of a claimant's pain, precipitating and aggravating factors, dosage and effectiveness of any pain medications, other treatment for the relief of pain, functional restrictions, and the claimant's daily activities.  *Id.*; *see Villano*, 556 F.3d at 562.

While the ALJ obtained a detailed description of Mr. Dogan's daily activities at the hearing, he never discussed why he found his activities inconsistent with his allegations of disabling pain and limitations.  At the hearing, for example, Mr. Dogan testified that he could wash dishes for only a "few minutes" because his knees would start to hurt and he would need to stop and sit down until his knees "settle[d] down enough."  (AR. 412-13).  He could also vacuum for about "10 to 15 minutes" at a time before he would need to sit down for 15 to 30 minutes to relieve his knee and leg pain, which he rated as a seven or eight.  (AR. 413-14).  Mr. Dogan also explained that he occasionally did laundry, but to do so he must go up and down six or seven stairs, which was difficult for him because he had to "navigate" stairs one step at a time.  (AR. 422, 428-29).  Accordingly, the ALJ's failure to explain why he believed Mr. Dogan was capable of performing light work (with certain exceptions) in view of his limited daily activities constitutes reversible error.  *See e.g.*, *Zurawski*, 245 F.3d at 887 ("The ALJ should have explained the 'inconsistencies' between [the claimant's] activities of daily living (that were punctured with rest), his complaints of pain, and the medical evidence"); *Clifford*, 227 F.3d at 872 (noting "minimal daily activities . . . do not establish that a person is capable of engaging in substantial physical activity"); *Carradine v.*

*Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004) (noting that the ALJ improperly found that the claimant could work because she could occasionally drive, shop and do housework).

Finally, the ALJ's errors are compounded by his recitation of the consistently criticized boilerplate statement that he rejected Mr. Dogan's description of his symptoms "to the extent they are inconsistent with the [RFC] assessment." (AR. 381). *See Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) ("Credibility findings must have support in the record, and hackneyed language seen universally in ALJ decisions adds nothing."). As the Seventh Circuit has made clear, finding statements that support the RFC credible and disregarding statements that do not "turns the credibility determination process on its head." *Brindisi ex rel. Brindisi v. Barnhart,* 315 F.3d 783, 787-88 (7th Cir. 2003). Here, the assessment of Mr. Dogan's ability to work necessarily hinges in large part on the credibility of his descriptions of the severity of his symptoms, and so the ALJ was required to factor his credibility into his assessment of the RFC, not use the RFC to determine his credibility. *See Bjornson v. Astrue*, 671 F.3d 640, 644-45 (7th Cir. 2012) (criticizing meaningless template as unhelpful and explaining that it backwardly "implies that the ability to work is determined first and is then used to determine the claimant's credibility"). Given the ALJ's failure to properly analyze Mr. Dogan's testimony regarding his pain symptoms and daily activities, this Court cannot be sure that he evaluated his credibility independently rather than dismissing his testimony to the extent it did not fit neatly within his RFC assessment. Based on all of these shortcomings, this Court cannot uphold the ALJ's credibility determination. *See Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) ("nothing in Social Security Ruling 96-7p suggests that the reasons for a credibility finding may be implied."). On remand, the ALJ must conduct a

reevaluation of Mr. Dogan's complaints of pain, with due regard for the full range of medical evidence.[3]

## B.  Disability Onset Date

Mr. Dogan next argues that the ALJ failed to properly determine the onset date of his disability as required by SSR 83-20.  (Pl.'s Mem. at 13-19).  He claims that the ALJ never performed the requisite analysis under SSR 83-20; instead, the ALJ arbitrarily found him disabled as of May 29, 2006, based on an x-ray diagnosing osteoarthritis or degenerative joint disease of the left knee. *Id.* at 13.  Thus, according to Mr. Dogan, in contravention of SSR 83-20, the ALJ did not consider his allegations, work history, and medical or other evidence in determining the onset date of his disability.  *Id.* at 14. But the Commissioner defends the ALJ by asserting that he was not required to apply the SSR 83-20 analysis because he properly relied on the ME's opinion that the medical evidence first established Mr. Dogan's entitlement to disability under Listing 1.02A on May 29, 2006, the date of the diagnostic test.  (Def.'s Mem. at 5).  According to the Commissioner, even if the ALJ's disability determination had not been based on the subject diagnostic test, Mr. Dogan cannot point to any evidence prior to May 2006 to support his claim that he had a disabling left knee impairment.  *Id.* at 5-7.  Therefore, the Commissioner contends that substantial evidence supports the ALJ's decision that Mr. Dogan retained an RFC for light work (with certain exceptions) and

---

[3] Mr. Dogan also asserts that he is entitled to an award of benefits because the ALJ violated the law of the case doctrine established by the June 3, 2010 remand order as his second decision was based on the same flawed credibility determination that required reversal in the first appeal.  (Pl.'s Mem. at 9-13, 20).  He claims that the SSA demonstrated obduracy by not complying with the June 3, 2010 remand order and, if accepted, his testimony would lead to a finding that he is disabled.  Mr. Dogan cites *Wilder v. Apfel*, 153 F.3d 799, 804 (7th Cir. 1998), as an example of the Seventh Circuit's willingness to order an award of benefits when the SSA has been obdurate, refusing to apply controlling law and follow the law of an earlier decision.  But the Seventh Circuit later clarified in *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 357 (7th Cir. 2005), that "[o]bduracy is not a ground on which to award benefits; the evidence properly in the record must demonstrate disability."  The Court declines to award benefits because the critical factual dispute herein is whether Mr. Dogan was disabled prior to his date last insured, December 31, 2002, which is a necessary condition for an award of benefits.

could perform a significant number of jobs prior to May 29, 2006, despite his functional limitations. *Id.*

SSR 83-20 provides that in a case such as this, where "the alleged onset and the date last worked are far in the past and adequate medical records are not available," an ALJ must infer the onset date of a disability. 1983 WL 31249, at *2. The ALJ must consider three factors when determining the onset date for a disability of nontraumatic origin: "(1) the claimant's alleged onset date; (2) the claimant's work history; and (3) medical and all other relevant evidence." *Briscoe*, 425 F.3d at 353 (citing SSR 83-20, 1983 WL 31249, at *2). The claimant's alleged onset date of disability "should be the starting point of the analysis, and that date 'should be used if it is consistent with all the evidence available.'" *Id.* (citing SSR 83-20, 1983 WL 31249, at *3). While the day the claimant stopped working because of the impairment is relevant, "the medical evidence is 'the primary element in the onset determination,' and the date chosen 'can never be inconsistent with the medical evidence of record.'" *Id.* (citing SSR 83-20, 1983 WL 31249, at *2, *3). But this does not mean that a claim is "doomed for lack of medical evidence establishing the *precise* date an impairment became disabling." *Id.* (emphasis in original). Rather, in these types of circumstances, an ALJ "must 'infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process'" and should call upon the services of a medical expert to make the required inference. *Id.* (citing SSR 83-20, 1983 WL 31249, at *2). However, if there is no reasonable basis upon which to make an inference and additional medical evidence is not available, "it may be necessary to explore other sources of documentation . . . from family members, friends, and former employees to ascertain why medical evidence is not available for the pertinent

period and to furnish additional evidence regarding the course of the individual's condition." *Id.* (citing SSR 83-20, 1983 WL 31249, at *3).

Here, the ALJ found that Mr. Dogan's knee impairment met Listing 1.02A on May 29, 2006, and that he was disabled as of that date. In finding when Mr. Dogan's impairment first met Listing 1.02A, the ALJ relied on a May 29, 2006, x-ray diagnosing osteoarthritis or degenerative joint disease of the left knee and determined that the combination of his knee arthritis and his massive obesity resulted in an inability to ambulate effectively. (AR. 287, 383, 386). Specifically, in assessing the medical evidence, the ALJ stated that Mr. Dogan's "light residual functional capacity assessment prior [to] May 2006 is supported by the important evidence of record that there was no diagnosis of degenerative joint disease of a knee prior thereto, just a right knee sprain that in combination with morbid obesity that would not preclude light exertion and occasional postural activity." (AR. 383). But the ALJ's apparent reliance on this first date of diagnosis of Mr. Dogan's osteoarthritis "is contrary to SSR 83-20 which holds that 'in the case of slowly progressive impairments, it is not necessary for an impairment to have reached listing severity (i.e. be decided on medical grounds alone) before onset can be established." *Briscoe*, 425 F.3d at 353 (citing SSR 83-20, 1983 WL 31249, at *2); *see also Lichter v. Bowen,* 814 F.3d 430, 436 (7th Cir. 1987) (noting that under SSR 83-20 an ALJ is not permitted to rely on the first date of a diagnosis because an earlier diagnosis date is not available).

In determining the disability onset date, the ALJ was required to consider Mr. Dogan's allegations, his work history, and any medical or other evidence in the record. But here the ALJ failed to provide the requisite analysis under SSR 83-20. First, as discussed in Part A of this opinion, Mr. Dogan testified that in 1995 or 1996 he injured his knees, particularly his right one,

when he fell down on some ice. (AR. 399-400, 06). He explained that he tried to work for about a year after he was injured, but because his knees got progressively worse, he was unable to continue working. *Id.* Mr. Dogan described first having pain in his right leg, but later he also developed pain in his left leg. (AR. 406). He indicated that he had right knee pain as high as a "10" and was told that he needed a knee replacement, but he was too heavy to have one. (AR. 409). Mr. Dogan explained the multiple limitations for the period 1997 through 2002 that resulted from his severe knee and leg pain, which included an inability to stand for more than 20 minutes, walk more than 100 feet, and sit for more than 30 minutes. (AR. 419-21). He also described limited daily activities, being able to lift and carry only 10 pounds, and elevating his legs seven hours each day. (AR. 419, 412-14, 421-22). While the ALJ mentioned these allegations in his decision, he never discussed how they would factor into a determination of the onset date of Mr. Dogan's disability.

Next, the ALJ was required to consider Mr. Dogan's work history. The Court's own independent review of the record establishes that Mr. Dogan has a 20 year consistent work history, which began in 1977 and ended in 1997. (AR. 146). After 1997, with the exception of earning $48.00 in 2006, there are no additional earnings records for Mr. Dogan. *Id.* Here, the ALJ never discussed Mr. Dogan's work history in the context of analyzing the onset date of Mr. Dogan's disability even though that history appears to be consistent with his allegations of disabling knee and leg pain and resultant limitations.

Furthermore, under SSR 83-20, the ALJ was required to consider the full range of medical evidence in determining Mr. Dogan's onset date. Here, the medical evidence establishes that Mr. Dogan began to suffer from right knee and leg pain as early as 1996. Dr. Pruitt first diagnosed Mr. Dogan with a sprain of the collateral ligament of the right knee in February 1996. (AR. 226). A

treatment note from January 1997 indicates that Mr. Dogan had right knee pain and he injured his knee in 1996. (AR. 218). Another treatment note from April 1997 reflects that Mr. Dogan twisted his right leg, and his knee was very painful. (AR. 219). When Mr. Dogan had a follow-up visit later that same month, his knee was still painful. *Id.* A treatment note from January 1999 stated that Mr. Dogan continued to have knee problems and that he was last treated in April 1997, but he could not afford to see a physician. (AR. 222). Mr. Dogan explained to a physician in February 1999 that he had pain in the right knee while standing since 1996, and there had been no change in his symptoms. (AR. 223). A treatment note from December 2005 indicates right knee pain from an injury in 1995 or 1996 with pain, swelling, stiffness and limitation of movement. (AR. 268). With respect to Mr. Dogan's left knee, in 2006, treatment notes reflect knee and leg pain, crepitus with movement of the knee, generalized tenderness and mild effusion. (AR. 259, 260, 262). Finally, there are several diagnoses of bilateral osteoarthritis or degenerative joint disease of the knees noted in the medical records in 2006, with one record specifically indicating in the history portion of the treatment note that Mr. Dogan had been diagnosed with early bilateral degenerative joint disease several years earlier. (AR. 259, 262).

But the ALJ did not discuss this medical evidence in the context of analyzing Mr. Dogan's onset date of disability and a reasonable inference can be made that he had degenerative joint disease prior to May 29, 2006. Here, the ME testified that it was "not impossible" that the left knee arthritis indicated in Mr. Dogan's May 29, 2006, x-ray could have been present in his knee in 2002. (AR. 434). Additionally, given the combined pain and limitations in standing, walking, and sitting that culminated, in part, from Mr. Dogan's right knee sprain and morbid obesity, he may also have been incapable of performing light work (with certain exceptions) prior to May 29, 2006. Because this

Court's review of the record indicates that Mr. Dogan's allegations, work history, and medical evidence are generally consistent with respect to his alleged onset date of disability of April 1, 1997, on remand, the ALJ shall apply the inferential analysis required under SSR 83-20 to determine if Mr. Dogan was, in fact, disabled prior to December 31, 2002, his date last insured. While there is no medical evidence as to the precise onset date, because it appears that the disabling impairment(s) occurred prior to the date of the first diagnostic evaluation, the ALJ "should call on the services of a medical advisor" to help in making the necessary inferences.[4] (AR. 287); SSR 83-20, 183 WL 31249, at *3. If necessary, the ALJ should also consider other non-medical evidence to assist in determining the onset date. SSR 83-20, 183 WL 31249, at *3 ("Information may be obtained from family members, friends, and former employers to ascertain why medical evidence is not available for the pertinent period and to furnish additional evidence regarding the course of the individual's condition."). *See e.g., Accurso v. Astrue,* No. 10 C 968, 2011 WL 578849, at *7 (N.D. Ill. Feb. 9, 2011) (remand ordered where the ALJ did not employ the analysis under SSR 83-20 and the evidence showed that the onset of the claimant's knee impairment may have arisen at an earlier date). Therefore, the Court remands this case to the ALJ to review the record evidence and address the issue of the onset date of Mr. Dogan's disability.

## CONCLUSION

Based on the foregoing, the Court hereby **GRANTS** Plaintiff's Memorandum in Support of His Motion to Reverse the Decision of the Commissioner of Social Security [DE 19] and **REMANDS** this matter for further proceedings consistent with this opinion.

---

[4] At the March 9, 2011 administrative hearing, the ME testified that any retrospective opinion that he could give regarding Mr. Dogan's left knee osteoarthritis would be limited to six months prior to the May 29, 2006, x-ray diagnosing this impairment. (AR. 435). But as discussed, Mr. Dogan's allegations, work history, and medical evidence support a conclusion that he was disabled at some point before 2006.

SO ORDERED this 11th day of September, 2012.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:     All counsel of record